(R.D. 11663)

International Knitting Machines Corp.
Inter-Maritime Forwarding Co., Inc. } v. United States

Entry Nos. 986206; 899077.

(Decided April 17, 1969)

*Allerton deC. Tompkins* for the plaintiffs.

*William D. Ruckelshaus,* Assistant Attorney General (*Sheila N. Ziff* and *Andrew P. Vance,* trial attorneys), for the defendant.

FORD, Judge: The merchandise which is the subject of these consolidated appeals for reappraisement consists of two machines described on the invoices as Flat V-Bed Knitting Machines, one a model HLJ and the other a model DL. They were exported from Spain on November 24, 1966, and January 30, 1967, and were appraised on the basis of cost of production as defined in section 402a(f), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956. Plaintiffs claim that the proper basis of appraisement is foreign value as defined in section 402a(c) of said act, as amended. The parties agree that the merchandise is described on the final list of the Secretary of the Treasury, 93 Treas. Dec. 14, T.D. 54521, and is therefore subject to appraisement under the so-called "old" law of valuation, the relevant portions of which are as follows:

Section 402a of the Tariff Act of 1930, as amended:

(a) BASIS.—For the purposes of this Act the value of imported merchandise shall be—

(1) The foreign value or the export value, whichever is higher;

(2) If the appraiser determines that neither the foreign value nor the export value can be satisfactorily ascertained, then the United States value;

(3) If the appraiser determines that neither the foreign value, the export value, nor the United States value can be satisfactorily ascertained, then the cost of production;

\*   \*   \*   \*   \*   \*   \*

(c) FOREIGN VALUE.—The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale for home consumption to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

\*   \*   \*   \*   \*   \*   \*

    (f) COST OF PRODUCTION.—For the purpose of this title the cost of production of imported merchandise shall be the sum of—

    (1) The cost of materials of, and of fabrication, manipulation, or other process employed in manufacturing or producing such or similar merchandise, at a time preceding the date of exportation of the particular merchandise under consideration which would ordinarily permit the manufacture or production of the particular merchandise under consideration in the usual course of business;

    (2) The usual general expenses (not less than 10 per centum of such cost) in the case of such or similar merchandise;

    (3) The cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the particular merchandise under consideration in condition, packed ready for shipment to the United States; and

    (4) An addition for profit (not less than 8 per centum of the sum of the amounts found under paragraphs (1) and (2) of this subdivision) equal to the profit which ordinarily is added, in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in the country of manufacture or production who are engaged in the production or manufacture of merchandise of the same class or kind.

As always the burden of the plaintiffs includes disproving the value found by the appraiser and satisfying all the statutory criteria of the value for which it contends. In actuality, this burden is concentrated herein on the issue of foreign value since if such a value is shown to exist it is given precedence over cost of production by the above quoted statute and the value found by the appraiser under the latter would, of necessity, fall.

A statement of the burden of the plaintiffs herein is virtually a reiteration of the statute with emphasis on key phrases. Thus, plaintiffs must prove that at the time of exportation such or similar machines were freely offered for sale, without restrictions, for use in Spain to all purchasers in the principal markets of Spain in the usual wholesale quantities, in the ordinary course of trade including the further costs detailed by the statute. In support of its claim plaintiffs offered certain documentary evidence consisting of two affidavits by Matias Mestre Mas, president and general manager of the concern which manufactured the machines in question. Defendant raised certain objections to the form of the first affidavit, dated February 27, 1968, prompting plaintiffs to introduce a second affidavit dated June 7, 1968. Defendant's objections were later withdrawn leaving both affidavits in evidence for the consideration of this court. Except for some slight additional information in the second affidavit the two contain virtually the same

affirmations. For ease of reference I will rely herein on the second affidavit of Matias Mestre Mas, dated June 7, 1968. The following portions of that affidavit are set forth for the purpose of the analysis which will ensue:

Matias Mestre Mas, being duly sworn deposes and says:

I now am, and since 1942 I have been the President and General Manager of M. Mestre Mas, Barcelona, Spain, who are manufacturers of machinery, including flat bed or flat V-bed knitting machinery and related equipment. I am personally responsible for and supervise the purchase of raw materials, and the production and the sales of the articles produced by my company. Said flat bed or flat V-bed knitting machines are used primarily for the purpose of knitting components for knit garments (primarily sweaters), such as collars and borders.

In 1960, and prior thereto, my company produced about 10 machines per year, which were then sold domestically only in Spain and Portugal. In 1960 I entered into an agreement with Joseph Kopelowitz, Inc., 600 Broadway, Brooklyn, New York, U.S.A., wherein, among other things, I granted to that company the exclusive distributorship for the sale of my company's knitting machines and parts within the territory of North America, Central America and South America. This exclusive distributorship arrangement was in August 1963 assigned from said Kopelowitz to the International Knitting Machines Corp., 60–06 55th Street, Maspeth, Queens, New York, U.S.A. and the exclusive distributorship area was enlarged to include also Asia, Africa, Australia, England, Scotland, Ireland, France and Italy. Thereafter, in March 1964 the exclusive distributorship area was enlarged to include the world, excluding only the countries of Spain and Portugal.

\* \* \* \* \* \* \*

Each of the machines as described herein that is sold domestically in Spain has a motor attached that operates on a voltage of 180 volts to meet Spanish electrical supply requirements, whereas the motors on the machines sold for shipment to the United States operate on a voltage of 220 volts. Thus, while the machines sold for domestic consumption in Spain are the same as the machines sold to the United States of America, the motors on the two classes of articles are not identical but are similar and have the same value. This gives me problems about whether to describe the entries for Spanish consumption as being the "same" or as "similar" to the entries shipped to the United States. Both answers are correct, depending upon whether these terms should be given broad or narrow meanings.

I list below the sales prices for the various machines sold to said Kopelowitz or International Knitting Machines Corp., all prices are F.O.B. Port of Barcelona, Spain, packed.

[There follows a list of sales to International Knitting Machines Corp. covering sales from 1961 through 1967 and including cost of packing of $170.50 per machine.]

My company offers the same identical machines as specified above, without restrictions of any kind to anyone in Spain or Portugal who wants to buy them, and it has done this since 1960 up to the present time. My company has continued to sell such machines directly to such buyers in Spain and in Portugal without any control by my company over the buyers resale price, the area within which the buyer may resell, or the uses to which the buyer may put the machines. The Spanish and Portuguese people who are interested in the machines made by my company have either come to my plant and arranged for the sale, or it has been done by correspondence. My company has always had a uniform sales price policy, but it has not issued a price list as the demand for the machines in Spain and Portugal does not warrant such a publication; the price is the same for one or more machines as specified below. All Spanish and Portuguese sales have been and are based on F.O.B. prices at the factory with terms of payment, cash only. In instances where extended credit terms are desired, my firm charges regular banking interest rates, based upon the time or financial risks involved. The packing costs have been charged extra to the customers in Spain and Portugal and are not listed in the prices in the schedules below. There have been and are no taxes on such sales.

There is listed below a schedule giving accurate details of all sales (orders placed with my company) by my company to Spanish buyers during the period from 1961 through November 1967. None of the specified sales were made to persons or concerns who were related in any way to me or to my company; they were business customers only :–

[There follows a list of twenty three sales made to seven purchasers covering the period 1961 to 1967 and involving the models HLJ, DL, TR and DLT. Five of these sales involve the latter two models, the model TR selling at 102,000 pesetas and the model DLT at 121,000 pesetas.]

All of the above machines were sold delivered at the factory. Packing and crating for domestic shipments are about 170.00 (U.S. dollars) or 10,200.00 old and 11,900.00 new Spanish Pesetas. The buyer pays for the transportation to him, and the amount is dependent upon distance, method of transportation, etc.

There are no other competitive knitting machines (flat bed or flat V-bed), being produced in Spain. I personally know that nothing has been produced in Spain by others that is in any way competitive to the machines my company has sold to the said JOSEPH KOPELOWITZ, INC. or the INTERNATIONAL KNITTING MACHINES CORP. All sales by my company have been and are made from its plant at Barcelona. There has been, and there is no other place in Spain from which the above-specified machines have been sold.

There being no question as to the admissibility of this affidavit, I turn to the question of the weight to be given to it. It is settled that it is for this court to decide the weight of affidavits and other evidence as to the facts. *Golding Bros. Co., Inc.* v. *United States*, 22 CCPA 590,

T.D. 47585. Defendant contends that the affidavit contains, not evidentiary facts, but rather conclusory statements which have no evidentiary value. *Brooks Paper Company* v. *United States*, 40 CCPA 38, C.A.D. 495; *Midland Industrial Company* v. *United States*, 57 Cust. Ct. 668, R.D. 11235. I am not inclined to accept this contention for after a close study of the affidavit I find that each and every statutory element of foreign value and every conclusory statement in reference thereto is supported by clear, and substantial evidentiary material. See *United States* v. *North American Asbestos Corp.*, 48 CCPA 153, C.A.D. 783.

First, the relation of the machines in question to the machines sold in Spain as being identical is shown by affiant's statement that these machines were the same except for differences in the motors to accommodate differing electrical conditions. The description which precedes the lists of sales also supports this conclusion. In any event, the similarity is undisputed.

Second, the conclusion that such or similar machines were freely offered for sale in Spain may be inferred from a number of subsidiary facts contained therein: the complete list of all sales for home consumption, the statement that the manufacturer exerted no control over the resale price, resale area or use, the statement that interested buyers arranged for purchases on visits to the plant or by correspondence. I note here that the size of the home market is not relevant to a finding of its existence. *Ann-Lee, Inc.* v. *United States*, 55 Cust. Ct. 635, Reap. Dec. 11093.

Third, the need for proof of usual wholesale quantities is obviated by the statements in the affidavit that the price is the same for one or more machines. *Jenkins Brothers* v. *United States*, 25 CCPA 90, T.D. 49093; *Luria Steel & Trading Corp. et al.* v. *United States*, 42 Cust. Ct. 480, Reap. Dec. 9311.

Fourth, the fact, attested to in the affidavit that the manufacturer is the only one producing such machines in Spain would tend to establish that its course of trade is the ordinary one in such matters. *American Shipping Co. (General Electric X-Ray Corp.)* v. *United States*, 29 CCPA 250, C.A.D. 198; Chr. *Bjelland & Co., Inc.* v. *United States*, 52 CCPA 38, C.A.D. 855.

Fifth, the position of the manufacturer as the sole producer of such machines also supports the obvious conclusion that the market in which he makes his sales is the principal market, in this case Barcelona.

Sixth, the affiant's description of the exclusive arrangement existing with International Knitting Machines supports a conclusion that neither export value nor United States value existed. The machines were not freely offered for sale for exportation or United States consumption.

As indicated above the manufacturer's affidavit constitutes *prima facie* proof of the existence of a foreign value for the machines in question. The only direct attack on this affidavit aside from defendant's contention that it is conclusory in nature consisted of a Bureau of Customs questionnaire (Form A–4) placed in evidence as defendant's exhibit B. This form was sent to the manufacturer herein by customs examiner, Roy Dewing, Jr., as an informal inquiry with regard to sales of knitting machines in the manufacturer's home market. It was filled out and returned in the latter part of 1962. In reply to the first question as to whether merchandise such as that exported to the United States was freely offered for sale in the home market for home consumption, Mr. Mestre Mas answered in the negative. In reply to the second query which asked the same question about "similar" merchandise, Mr. Mestre Mas answered in the affirmative. I do not consider these responses to contradict, discredit or detract from any statements made in the affidavit. Affiant's reluctance to reply in the affirmative to the first question is explained in the affidavit by his doubts as to the consequence of the motors on the home market machines having different voltage requirements. I therefore am of the opinion that defendant's exhibit B does not in any way tend to disprove the finding that machines such as those involved herein were freely offered on the home market.

At the trial, testimony was given by Larry Kopelowitz, president of the importer. His testimony regarding the nature of the importations and the agreement under which they were imported is obscured by defendant's attempt at impeachment, the entanglements of which occupy virtually the entire record. I do not consider it necessary or judicious at this time to enter into a detailed discussion of that portion of the record except to note that it touches on the invoicing practices of the importer with regard to importations of these machines during a period prior to that involved herein. It suffices to say that the embroilments in that area do not affect the existence of a foreign value and do not affect the validity of the affidavit of the manufacturer or the reliance I place thereon.

In light of the foregoing, I make the following findings of fact:

1. The merchandise covered by these consolidated appeals for reappraisement consists of flat V-bed knitting machines exported from Spain on November 24, 1966, and January 30, 1967.

2. That said merchandise was appraised on the basis of cost of production as defined in section 402a(f), Tariff Act of 1930, as amended.

3. That such merchandise was sold exclusively to International Knitting Machines Corp. outside Spain and Portugal.

4. On and about the date of exportation such and similar machines were freely offered for sale for home consumption to all purchasers

in Barcelona, the principal home market in the usual wholesale quantities and in the ordinary course of trade.

5. The price of such machines on the home market was 121,000 pesetas for the DL with transfer, known as the DLT, and 102,000 pesetas for the HLJ with transfer, also known as the TR.

6. The costs, charges and expenses incident to placing the machines in condition packed ready for shipment to the United States were $170.50 per machine.

Accordingly, I conclude as matters of law:

1. Foreign value, as that value is defined in section 402a(c), Tariff Act of 1930, as amended, is the proper basis of value for the appraisement of these machines.

2. Such value is the sum of the values set forth in findings of fact numbers 5 and 6.

Judgment will be entered accordingly.